OPINION OF THE COURT
Joan B. Lobis, J.
In motion sequence No. 002, defendant Beth Israel Medical Center (the Medical Center) brings this motion for an order, pursuant to CPLR 3212, dismissing the complaint against it on the ground that there are no issues of fact requiring determination by a jury. Plaintiff Arthur J. Midgett, proceeding pro se, opposes the motion.
On March 16, 2008, plaintiff presented himself to the Medical Center with increased religious preoccupation and thoughts of killing himself. His past medical history included a diagnosis of schizophrenia, cocaine abuse, and occasional alcohol use. Plaintiff voluntarily admitted himself to the psychiatric unit. That evening, plaintiff permitted a nurse to draw his blood and collect his urine for laboratory analysis. The results from the blood work indicated that plaintiff had an abnormally high white blood count and creatinine levels. Thereafter, on March 17, 18, and 19, plaintiff refused to allow anyone to draw his blood. Defendant’s staff explained the importance of allowing the blood work, but plaintiff refused based on his belief that he was anointed by God and that drawing his blood would make him weaker. Plaintiff remained delusional and religiously preoccupied, claiming that he was God. On March 18, when he refused to provide samples, plaintiff asked the nurse to obtain his files from Bellevue Hospital. On March 19, plaintiff told an examining physician that he was “anointed,” and that was why his white blood count, blood pressure, and cholesterol were at increased levels. The physician noted that plaintiff had presented with a chronically elevated white blood count for at least one year and newly elevated creatinine levels, and that plaintiffs prior records from Bellevue needed to be obtained because plaintiff had stated that he had prior blood work performed there. The physician further noted that the increased creatinine levels were likely due to a “pre-renal cause.” The examining physician noted that plaintiffs SMA-7, magnesium, and phosphorus levels should be reexamined. A later note on *227 March 19 by Omer Liran, M.D., set forth that plaintiff had been refusing blood work due to plaintiffs belief that his blood levels were abnormal as a result of having been ordained by God. Dr. Liran noted that given the high white blood counts and high creatinine levels, drawing blood was necessary and urgent, and therefore plaintiff could not refuse the blood draws. Dr. Liran set forth that plaintiff did not have the capacity to make medical decisions for himself because he did not understand the risks versus the benefits of treatment.
Thereafter, on March 19, the Medical Center converted plaintiffs status from “voluntary” to “involuntary,” under Mental Hygiene Law § 9.27. Two physicians — Melinda S. Lantz, unit chief, and Dennis Lin, M.D., plaintiffs attending physician — certified that plaintiff was a danger to himself. An administrator also signed an application for involuntary admission. Plaintiff was given a “Notice of Status and Rights, Conversion to Involuntary Status.” Plaintiffs blood was drawn that same day; the nurse’s notes indicate that blood was drawn with assistance from security. Upon testing, the blood showed an elevated white blood count.
On March 20, notes from an examining physician indicate that plaintiff was calmer. His creatinine levels had normalized; this was attributed to better nutrition and hydration. Plaintiffs white blood count was still noted as “chronically elevated.” A hematology consult was ordered, and again the physician noted that the patient’s old records from Bellevue should be obtained. That same day, plaintiff became agitated when approached for a blood draw, but was “compliant when security [was] present.” The blood draw was ordered for a leukemia and lymphoma panel to rule out blood disorders. Plaintiffs delusions and preoccupation with religion continued. Plaintiff remained at the Medical Center as an involuntary admittee until March 25, when he was converted back to voluntary status. On April 4, 2008, plaintiff was discharged to home with a diagnosis of B-cell chronic lymphocytic leukemia, but he did not believe his diagnosis because he attributed the blood results to his being anointed by God. Plaintiff was discharged with instructions to follow up with a psychiatrist and hematologist within three months.
On September 15, 2008, plaintiff commenced this action by the filing of a summons and complaint (the first complaint). The first complaint raised claims sounding in civil conspiracy and civil assault. In February 2009, the Medical Center moved for an order dismissing the first complaint on the grounds that *228 the complaint failed to state a cause of action and, alternatively, that there were no issues of fact requiring determination by a jury. Plaintiff opposed the motion. By decision and order dated May 15, 2009, the court dismissed the claim sounding in civil conspiracy because New York does not recognize such a claim. The first complaint did make out a claim for civil assault, and triable issues of fact existed precluding summary judgment, so the court allowed the action to continue on the claim for civil assault.
On or about November 16, 2009, plaintiff commenced a second action against the Medical Center (Midgett v Beth Israel Med. Ctr., index No. 402891/09). In his second complaint (the second complaint), he alleges that the Medical Center improperly released his medical records to its attorneys, Wenick & Finger, PC. (Wenick & Finger). Plaintiff also claims that the Medical Center inserted fraudulent documents into the medical records. By decision and order of this court dated February 16, 2010, the two actions were consolidated under the instant index number.
Plaintiff has provided defendant with a bill of particulars and has been deposed. Plaintiff waived his right to depose a representative from the Medical Center but submitted interrogatories, to which the Medical Center responded. The transcripts and responses to interrogatories are annexed to defendant’s motion papers, along with a copy of the medical records.
Plaintiff alleges that he was forced by defendant to give blood samples on March 19 and 20, 2008. He alleges that on those dates, physicians from the Medical Center “called security guards” on him, conspired to and did draw his blood against his will, and that the security officers were called to manipulate and humiliate him and cause him fear. He claims that the result was an assault on his person. Plaintiff also alleges that the Medical Center improperly released his records to Wenick & Finger without his authorization and fraudulently altered his records. He claims that these improper acts caused him actual damages and mental anguish, and he also seeks punitive damages.
Initially, plaintiff argues that defendant’s motion for summary judgment is untimely. This argument is rejected. On June 15, 2010, this court ordered that defendant’s time to file a motion for summary judgment by order to show cause was extended to 60 days from the date of the order. The sixtieth day was Saturday, August 14, 2010. Defendant filed its motion on the following Monday, August 16, 2010. The motion shall be considered timely. (See General Construction Law § 25-a.)
*229 Turning to the merits of the motion, defendant argues that the cause of action for civil assault must be dismissed because the blood draws performed on March 19 and 20, 2008, were performed in accordance with 14 NYCRR 27.8 (b), which provides that “[facilities may give treatment ... at any time to all patients [voluntarily or involuntarily admitted], despite objection in a case where the treatment appears necessary to avoid serious harm to life or limb of the patients themselves or others.” (14 NYCRR 27.8 [b] [1], [3] [iv].) Defendant contends that the blood draws were urgently needed to rule out whether a life-threatening infection was present. In support of this contention, defendant proffers two affirmations from physicians who treated plaintiff, and one from an expert. Dr. Lin, the attending physician in the Department of Psychiatry at the Medical Center, states that the blood tests taken upon plaintiff’s admission revealed that plaintiff had a high white blood count and a high creatinine level. Dr. Lin sets forth that “[a]s these abnormal values were indicative of a possible infection, blood disease, or renal disease, it was deemed urgent that these labs be repeated and monitored in order to provide necessary medical care.” The resident in the Department of Psychiatry at the Medical Center, Omer Liran, M.D., makes the same statement as Dr. Lin, that “[a]s these abnormal values were indicative of a possible infection, blood disease, or renal disease, it was deemed urgent that these labs be repeated and monitored in order to provide necessary medical care.” The expert physician, Philip R. Muskin, M.D., opines that the physicians on staff at the Medical Center
“believed it was urgent to conduct an additional blood draw given Mr. Midgett’s high white blood cell count. . . and high creatinine level. These abnormal values were indicative of a possible infection, or blood disease, and it was deemed urgent by hospital staff that these labs be repeated and monitored in order to provide necessary medical care.”
All three physicians contend that once plaintiff was deemed to be a danger to himself and his status was changed from voluntary to involuntary, plaintiffs blood was drawn in the presence of security with plaintiffs compliance, without unwanted touching or restraints. Dr. Muskin opines that the blood draws were a necessary part of plaintiffs health care. Plaintiffs “elevated white blood cell counts could have represented an immediate threat to him and required further evaluation.” He sets forth that the second blood draw on March 20, 2008, was required to *230 rule out blood disorders. The Medical Center could not know how dangerous plaintiffs blood count was until he was further evaluated. Dr. Muskin contends that there was insufficient time to seek a court order, and that taking the time to seek a court order could have put plaintiff at serious risk of injury. He further opines that plaintiffs delusions prevented him from comprehending that the abnormal blood results could be a sign of serious infection or blood disorder that would require immediate treatment.
“Summary judgment is a ‘drastic remedy’ that should only be employed where no doubt exists as to the absence of triable issues. The key to such procedure is issue-finding, rather than issue-determination.” (Leighton v Leighton, 46 AD3d 264, 265 [1st Dept 2007], quoting Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395, 404 [1957].) Defendant has not demonstrated that it is entitled to summary judgment on the issue of whether the blood draws were proper because defendant has failed to eliminate certain issues of fact, particularly the issue that it was necessary to perform the blood work over plaintiffs objection in order to avoid serious harm to plaintiff’s life. Plaintiff admitted himself voluntarily and provided one voluntary blood sample. The medical records indicate that his physicians knew that plaintiffs white blood count and creatinine levels were chronically higher than normal as early as his admission to the Medical Center. The physicians then waited until three days after the initial blood draw — three days over which plaintiff consistently objected to any further drawing of his blood — to convert his status from voluntary to involuntary, whereupon they drew his blood. The fact that the physicians waited three days to perform the second blood draw does not correspond to the claims of immediacy and urgency and is unexplained by the three doctors who submitted affirmations. There was no outward decline in plaintiffs physical health over these three days. The medical records contradict defendant’s expert’s opinion that there was insufficient time to seek a court order and that immediate follow-up blood work was urgent and necessary. An issue of fact remains about the urgency of the situation, thus precluding summary judgment.
As to plaintiffs claim that the Medical Center improperly disclosed his medical records to its attorneys, Wenick & Finger, without his authorization, the Medical Center argues that federal regulations allow for medical records to be released to its attorneys, without an authorization, in connection with a *231 lawsuit against it, and so the release of plaintiffs records to Wenick & Finger was proper. Plaintiff argues that the federal regulations do not apply to the disclosure of his records and that his records are confidential information privileged under CPLR 4504, making the release of his records to Wenick & Finger without an authorization improper. Both arguments are flawed.
The physician-patient privilege is codified in CPLR 4504 (a), which sets forth that “[ujnless the patient waives the privilege, a person authorized to practice medicine . . . shall not be allowed to disclose any information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity.” It is well established in New York that affirmatively putting one’s physical or mental health in controversy by bringing a lawsuit constitutes waiver. Even with waiver, however, an authorization allowing the facility to release a patient’s records may be required.
The release of medical records is generally governed by the privacy provisions (45 CFR parts 160, 164) of the federal Health Insurance Portability and Accountability Act of 1996 (HIPAA) (42 USC § 1320d et seq.). HIPAA and its privacy provisions require, inter alia, that in order for medical records to be released by a covered entity under most circumstances, a duly executed authorization from the patient must accompany the request for records. In certain circumstances, an authorization is not required to release records, such as when the covered entity is sued and the records are being provided to counsel to defend the matter,[1] or in the case of court-ordered disclosure (45 CFR 164.512 [e] [1] [i]).
It is important to note that although the Medical Center treated plaintiff for a variety of nonpsychiatric issues, and his ultimate diagnosis related to the blood work was leukemia, which is not a psychiatric condition, he was admitted to the Medical Center as a psychiatric patient and the majority of his treatment records related to psychiatric care. This is an important distinction because in New York, the confidentiality of an individual’s clinical psychiatric records is held to a stricter standard than an individual’s general medical records. Under Mental Hygiene Law § 33.13, a facility may only disclose an *232 individual’s clinical psychiatric records to an entity or person outside the facility under certain specific enumerated circumstances set forth in section 33.13 (c), such as pursuant to a court order (§ 33.13 [c] [1]) or with the patient’s consent (§ 33.13 [c] [7]). There is no exception under section 33.13 (c) for releasing a patient’s clinical mental health records without authorization or court order to attorneys retained to defend a facility in conjunction with a lawsuit filed by that patient.[2] Furthermore, while defendant argues that New York State law should be preempted by HIPAA, the federal regulations specifically provide that HIPAA does not preempt state law when the “provision of State law relates to the privacy of individually identifiable health information and is more stringent than a standard, requirement, or implementation specification adopted under [45 C.F.R. §§ 164.500 through 164.534].”(45 CFR 160.203 [b].)[3] “More stringent” means that the state law “provides greater privacy protection for the individual who is the subject of the individually identifiable health information.” (45 CFR 160.202.) New York’s Mental Hygiene Law § 33.13 is more stringent than HIPAA when the records in question are clinical psychiatric records. Therefore, section 33.13 is not preempted by HIPAA and is the prevailing standard under which to evaluate the confidentiality and maintenance of clinical psychiatric records in New York. (See 45 CFR 160.203.)
The Medical Center has not demonstrated that it is entitled to summary judgment on the claim that it improperly released records without plaintiffs authorization. Plaintiff is entitled to the protection of Mental Hygiene Law § 33.13. The Medical Center did not secure an authorization from Mr. Midgett or a court order before releasing to Wenick & Finger his entire records, which contain psychiatric progress notes and other clinical records that were part of plaintiffs psychiatric admission. The question remains, however, whether plaintiff is *233 entitled to damages, either actual or punitive, as a result of the breach. Since he placed his physical and mental health in controversy by commencing this lawsuit against the Medical Center for events that occurred during his hospitalization, the defendant’s attorneys’ eventual ability to see these records was likely.
Finally, in his second complaint, plaintiff raises his belief that certain records were fabricated by the Medical Center and provided to Wenick & Finger. After the lawsuit was commenced, plaintiff obtained a copy of his records from Wenick & Finger. He also obtained his own copy directly from the Medical Center in January 2010. According to his deposition testimony in relation to the second complaint, in comparing the copy of the records provided to him from Wenick & Finger to the copy provided by the Medical Center, plaintiff believes that certain pages— specifically including the certifications by the physicians who converted his status from voluntary to involuntary — were fabricated after this lawsuit was commenced. This belief is partially based on a facsimile machine time stamp dated November 29, 2008 at the bottom of the allegedly suspicious records. Plaintiff also contends that the records are false because the examinations by the physicians who filled out the certifications never took place.
In support of its motion for summary judgment on the issue of fraudulent records, the Medical Center submits a copy of the record, together with an affidavit from Raymond Cosner, assistant vice-president of health information management and credential services at the Medical Center. He affirms that the copy of the records annexed to the motion is a true, complete, and accurate copy of plaintiffs record pertaining to his MarchlG through April 4, 2008 admission. Mr. Cosner sets forth that the November 29, 2008 facsimile time stamp across the bottom of some pages provided to plaintiff from Wenick & Finger represents the date on which they were transmitted by facsimile, not the date the records were created.
Plaintiff’s claim that “fraudulent documents [were] inserted in his medical records” is akin to an allegation of spoliation of evidence, which is not an independent tort in New York. (Ortega v City of New York, 9 NY3d 69, 83 [2007]; see also Pharr v Cortese, 147 Misc 2d 1078, 1079 [Sup Ct, NY County 1990, Sklar, J.].) Regardless, there are no material issues of fact in dispute regarding this issue. The Medical Center has provided proof that demonstrates that the allegedly suspicious records *234 were not added at a later date. Plaintiff has failed to rebut the Medical Center’s showing with any proof that the date that appears on the bottom of these records is anything other than a transmittal date that became affixed to a copy of the records at some point during the proceedings. Plaintiff has not demonstrated that this date is an “authentication date” or date of origin, as he claims. The claim that the Medical Center fraudulently inserted documents into plaintiffs medical chart is dismissed.
Accordingly, it is hereby ordered that defendant’s motion for summary judgment is partially granted, to the limited extent that defendant Beth Israel Medical Center is granted summary judgment on the spoliation claim (the claim that the Medical Center fraudulently inserted documents into plaintiffs medical chart), and that claim is hereby dismissed; and it is further ordered that the remainder of defendant’s motion is denied.

. Under 45 CFR 164.502 (a) (1) (ii) and 164.506 (c) (1), a hospital is permitted to disclose protected information in furtherance of its “health care operations” without an authorization. Health care operations include legal services. (45 CFR 164.501 [4].)

. The exceptions in Mental Hygiene Law § 33.13 (c) where an authorization is not required for the release of clinical mental health records are not applicable here.

. At the parties’ pretrial conference before the court on October 5, 2010, the court asked the parties for supplemental papers on the issue of whether HIPAA preempts Mental Hygiene Law § 33.13 and offered them time to submit their supplemental papers. Defendant’s papers were submitted by October 8; plaintiff declined the court’s offer to submit further papers on the issue. By supplemental attorney’s affirmation, the Medical Center argues that section 33.13 conflicts with the federal statute and is preempted. However, the Medical Center’s supplemental affirmation fails to address the nonpreemption clause in 45 CFR 160.203.